**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Divine Tower International Corporation, et al., | : | |
| | : | Case Nos.   2:04-cv-494 |
| Plaintiffs, | | 2:04-cv-584 |
| | : | |
| vs. | | |
| | : | JUDGE GRAHAM |
| Kegler, Brown, Hill & Ritter Co., L.P.A., et al., | : | |
| | | |
| Defendants. | : | |

<u>OPINION AND ORDER</u>

Plaintiffs Divine Tower International Corporation and its related corporate affiliates (collectively "Divine Tower") and Apollo Real Estate Investment Fund IV, L.P. bring this action against the law firm Kegler, Brown Hill & Ritter Co., L.P.A. and four individual attorneys, Charles Kegler, Todd Kegler, John Thomas, and Michael Zatezalo, employed by the Kegler Firm. Divine Tower retained the Kegler Firm to assist it in obtaining financing for the company. Divine Tower alleges that the Kegler Attorneys, in violation of their obligations to the company, provided legal assistance to certain individuals (hereinafter "the Divine Family") who controlled Divine Tower and executed a scheme to defraud the company. The compliant asserts numerous causes of action against the Kegler Firm and the Kegler Attorneys, including malpractice, fraud, civil conspiracy, and civil aiding and abetting.

This matter is before the Court on two separate motions: Defendants' partial motion to dismiss and Defendants' motion for summary judgment. The motion for summary judgment will be

discussed first, for it seeks complete dismissal of the complaint on grounds unrelated to the merits.  The motion focuses on a 2005 Settlement Agreement under which Plaintiffs, who had brought separate litigation against the Divine Family, released all claims against the Divine Family and their attorneys for their alleged conduct in defrauding the company.  Defendants argue that they are entitled to summary judgment because the plain language of the Settlement Agreement released all claims against the attorneys of the Divine Family.

As discussed below, the Court agrees with Defendants' argument in part.  The Settlement Agreement does release claims against the attorneys of the Divine Family.  Certain claims, such as those for conspiracy and aiding and abetting, arise out of Defendants' alleged actions in representing the Divine Family, and those claims are released.  However, there are other claims that the Settlement Agreement does not release, including Divine Tower's malpractice claim, because they relate to Defendants' representation of Divine Tower, the company, and not of the Divine Family.

After examining the motion for summary judgment, the Court will then review Defendants' partial motion to dismiss as it pertains to those claims that the Settlement Agreement did not release.

I.    **Background**

A.    **Divine Tower's Financing Efforts**

Divine Tower was a construction company run by the Divine Family: Thomas and Stephanie Divine, Robert Divine Sr., Robert Divine Jr., and Bret and Sheri Marinello.  Led by Thomas Divine,

2

the Divine Family is alleged to have exercised control over Divine Tower at all times.

In April 1999, Divine Tower retained the Kegler Firm to represent it in construction disputes and financing matters. Initially, the Kegler Firm provided legal services related to Divine Tower's negotiations with Huntington National Bank, which had declared Divine Tower in default of a line of credit that Huntington had extended to the company.

Shortly after Huntington Bank declared the default, Thomas Divine sought financing from Deere Park Capital, L.L.C., a private investment group. The parties agreed that Deere Park would invest $15 million in Divine Tower in exchange for a 50% interest in the company. The agreement contained a "No Shop" provision under which Divine Tower agreed not to solicit or propose a sale, merger, or acquisition of equity interest of the company with anyone else. Deere Park initially made a $400,000 bridge loan to Divine Tower.

Notwithstanding the No Shop provision, Thomas Divine allegedly pursued financing for Divine Tower from Apollo. The parties reached a proposed agreement whereby Apollo would invest $15 million in Divine Tower in exchange for a 20% interest in the company. This agreement too contained a No Shop provision.

In July 1999, the Deere Park loan arrangement fell through. According to the complaint, both Divine Tower and Deere Park had misgivings. The complaint suggests that Thomas Divine wanted out of the Deere Park loan because the proposed arrangement with Apollo was a better deal -- Apollo wanted only a 20% stake in Divine Tower while Deere Park wanted 50%. According to the complaint, the parties reached a mutually-agreeable dissolution of their

3

relationship.

In July and August 1999, the Kegler Firm represented Divine Tower in an attempt to renegotiate Divine Tower's loan with Huntington Bank. Those attempts were not successful.

At the same time, Divine Tower pursued financing from KeyBank, N.A. KeyBank agreed to issue two lines of credit totaling $18 million to Divine Tower. One of the lines of credit was secured by a $10 million deposit at KeyBank, and the other line of credit was backed by personal guarantees of the Divine Family. The Kegler Attorneys assisted Divine Tower in obtaining the KeyBank lines of credit and allegedly did not disclose the matter to Apollo.

In late August 1999, Charles Kegler and Todd Kegler assisted Thomas and Stephanie Divine in setting up revocable trusts. Plaintiffs allege that the trusts enabled Thomas and Stephanie Divine to shelter their assets from the personal guarantees they had made to KeyBank. Plaintiffs contend that this trust arrangement undermined Divine Tower's interest in having the KeyBank lines of credit properly secured.

**B. Due Diligence and the Apollo Securities Purchase**

The Kegler Firm assisted Divine Tower in responding to Apollo's due diligence requests. Plaintiffs allege that during the due diligence process, the Kegler Attorneys began to shift their loyalties to the Divine Family. According to Plaintiffs, records show that the Kegler Attorneys met with members of the Divine Family in June 1999 and were well-aware of the violations of the No Shop provisions. Plaintiffs further allege that Charles Kegler began to offer personal tax and asset planning advice to the Divine Family members individually. Divine Tower was billed for those

4

personal legal services. Plaintiffs allege that Charles Kegler's representation of the Divine Family was a conflict of interest with his representation of the company.

In early September 1999, the Kegler Attorneys met with counsel for Apollo to discuss some unresolved due diligence issues. The Kegler Attorneys helped prepare Divine Tower's written response to Apollo's concerns. Plaintiffs allege that the response contained misrepresentations regarding the details of the failed Deere Park loan. Plaintiffs contend that the misrepresentations were designed to hide the breach of the No Shop provision from Apollo. Further, Plaintiffs allege that the response failed to disclose that Thomas and Stephanie Divine had established trusts to shield their personal assets from KeyBank.

Divine Tower and Apollo executed a Securities Purchase Agreement dated September 24, 1999. Plaintiffs allege that the Kegler Firm drafted the Purchase Agreement and that it contained several misrepresentations and omissions. Plaintiffs allege that it did not fully disclose the details surrounding the Deere Park loan. Further, where the Purchase Agreement purported to list all of Divine Tower's liabilities above $50,000, the KeyBank loan was not listed. According to the complaint, had the KeyBank loan been listed, Apollo would have then had a right under the Agreement to obtain copies of the KeyBank loan documents. Apollo alleges that the misrepresentations and omissions in the Agreement regarding KeyBank were designed to keep Apollo unaware of the Divine Family's plans to shield their assets.

Along with the Purchase Agreement, the Kegler Firm furnished a legal opinion letter (the "Opinion Letter"). Plaintiffs allege

5

the Opinion Letter failed to disclose, among other things, the nature of the Deere Park loan, the existence of the KeyBank loan, and the steps taken by the Divine Family to shield their personal assets.

Also furnished with the Purchase Agreement was a "due diligence certificate" drafted by the Kegler Firm and executed by Thomas Divine. Plaintiffs allege that the certificate was misleading because it represented that every representation made in the Purchase Agreement was true.

Once the Purchase Agreement was completed, Apollo held four seats on Divine Tower's eight-seat board of directors.

**C.    KeyBank Default**

In March 2000, KeyBank increased one of the lines of credit from $8 million to $14 million. The increase required the personal guarantees of the Divine Family. In October 2000, KeyBank declared the $14 million loan in default. KeyBank seized $10 million that had been deposited a year earlier to secure one of the lines of credit. KeyBank met with Thomas Divine and Apollo to discuss loan forbearance terms. KeyBank stated that it would consider recovering on the personal guarantees of the Divine Family.

In July 2000, Apollo restructured its equity position in Divine Tower, gaining a fifth seat on the board in exchange for providing additional financing. Even so, plaintiffs allege that the Divine Family retained de facto control over Divine Tower.

**D.    The Alleged Asset Protection Scheme**

Plaintiffs allege that throughout this time period, the Kegler Attorneys provided legal advice and services to the Divine Family. The advice culminated in the creation of a series of trusts, sham

6

corporations, and asset transfers designed to remove the personal assets of the Divine Family from the reach of KeyBank. The complaint alleges that Defendants' actions on behalf of the Divine Family were adverse to the interests of Divine Tower. Further, the complaint alleges that Divine Tower was charged with, and paid for, all of the legal bills associated with the trusts, sham corporations, and transfers.

In March 2002, Divine Tower was in a dire financial condition. Thomas Divine and Todd Kegler discussed creating a corporation to which to transfer Divine Tower's remaining assets and business opportunities. The alleged purpose of this scheme was to insulate the assets from Divine Tower's creditors in the event of bankruptcy. The new corporation was called Big Cat Crane and Services, L.L.C. Plaintiffs allege that the Divine Family wrongfully took construction equipment and other assets owned by Divine Tower and transferred ownership to Big Cat for no consideration.

**E.    The Kegler Firm's Purported Withdrawal**

After Big Cat was created, Todd Kegler sent a letter to Divine Tower and Apollo stating that the Kegler Firm would no longer represent either Divine Tower or the Divine Family because of a potential conflict of interest. Plaintiffs allege that this letter was misleading because the Kegler Firm had represented both Divine Tower and the Divine Family for three years despite the existence of a known conflict of interest.

Plaintiffs contend that notwithstanding the letter, Todd Kegler continued to provide legal services to the Divine Family. The representation included several lease disputes in which the

7

Divine Family had interests adverse to Divine Tower.

Plaintiffs also allege that the Kegler Firm accepted a payment from Divine Tower in the amount of $63,507 two months before Divine Tower declared bankruptcy.

**F.   Bankruptcy Proceedings**

On April 24, 2002, Divine Tower filed a Chapter 11 bankruptcy petition.  At this time, KeyBank assigned all of its interests regarding Divine Tower to Apollo.

The instant litigation originated as an adversary proceeding in the bankruptcy court.  Divine Tower, in its capacity as a Chapter 11 debtor, sued the Kegler Firm and the Kegler Attorneys for their alleged roles in assisting the Divine Family in defrauding Divine Tower.  Divine Tower also alleged that Defendants committed malpractice because of their dual representation of Divine Tower and the Divine Family, despite the parties' adverse interests.

Apollo joined Divine Tower as a plaintiff in the adversary proceeding.  Apollo brought direct claims as a defrauded investor and also indirect claims as assignee of KeyBank, another allegedly defrauded investor.

The reference of the adversary proceeding was withdrawn and the action is now before this Court.

A related adversary proceeding was filed by Divine Tower against the Divine Family.  In the complaint, Divine Tower alleged that the Divine Family defrauded the company through improper transfers and distributions to various trusts and sham corporations.  Apollo was not a party to the lawsuit.  The reference of that adversary proceeding was also withdrawn.  <u>See</u>

<u>Divine Tower International Corp, et al. v. Robert Divine, et al.</u>,
Case No. 2:04-cv-162 (S.D. Ohio, Marbley, J.).  The suit was later
voluntarily dismissed as part of the 2005 settlement agreement.

###    G.    Claims Asserted in this Action

Divine Tower asserts the following claims against the
Defendants: avoidable preference payments under 11 U.S.C. §547;
fraud with respect to legal services; malpractice, civil aiding and
abetting; civil conspiracy; and unjust enrichment.

Apollo asserts the following direct claims against the
Defendants: fraud; conspiracy; and violations of Section 10(b) of
the Securities Exchange Act of 1934, 15 U.S.C. §78j(b).  Apollo
asserts the following claims as assignee of KeyBank: fraud;
conspiracy; and aiding and abetting.

The complaint also purports to bring a claim for injunctive
relief barring Defendants from divesting assets (other than in the
ordinary course of business) pending the outcome of this
litigation.  Despite raising this claim in the complaint,
Plaintiffs have never pursued injunctive relief from the Court.

###    H.    The 2005 Settlement Agreement

In August 2005, Divine Tower, Apollo, each member of the
Divine Family, and the companies and trusts set up by the Divine
Family entered into a Settlement Agreement.  Under the Agreement,
both Divine Tower and Apollo:

> releases, acquits, forever discharges, and covenants not
> to sue the Divine Family (collectively and individually),
> the Divine Family Companies (collectively and
> individually), and the Trust Defendants (collectively and
> individually), and all of their respective agents,
> servants, employees, directors, officers, **attorneys . .
> .** from any and all causes of action, charges, attorneys'
> fees, costs, claims, demands, damages, losses, expenses,
> liabilities, obligations, and actions whatsoever, whether

> in tort, in contract, or pursuant to statute or
> regulation or otherwise; whether known or unknown . . .
> which [Divine Tower and Apollo] may have or claim to have
> against the Divine Family, the Divine Family Companies,
> and the Trust Defendants . . . .

Settlement Agr., ¶¶4,5 (emphasis added).

The Agreement contained the following paragraph regarding the Kegler Firm:

> No Release.  The parties agree that this Agreement does
> not release, acquit, or discharge any claim held by any
> party against Kegler, Brown, Hill & Ritter Co., L.P.A.

Id., ¶10.

## I.   Pending Motions

Defendants have filed a motion for summary judgement. Defendants argue that Divine Tower and Apollo agreed in the 2005 Settlement Agreement to release all of the claims that are asserted in this action.

Before filing the motion for summary judgment, Defendants filed a partial motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P.  In the motion, Defendants seek dismissal of all claims except those for malpractice and bankruptcy preference.


## II.  Motion for Summary Judgment

### A.   Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  See LaPointe v. United Autoworkers Local 600,

8 F.3d 376, 378 (6th Cir. 1993); <u>Osborn v. Ashland County Bd. of Alcohol, Drug Addiction & Mental Health Servs.</u>, 979 F.2d 1131, 1133 (6th Cir. 1992)(per curium).  The party that moves for summary judgment has the burden of showing that there are no genuine issues of material fact in the case at issue, <u>LaPointe</u>, 8 F.3d at 378, which may be accomplished by pointing out to the court that the nonmoving party lacks evidence to support an essential element of its case. <u>Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.</u>, 12 F.3d 1382, 1389 (6th Cir. 1993).  In response, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." <u>Moore v. Philip Morris Cos., Inc.</u>, 8 F.3d 335, 339-40 (6th Cir. 1993).  "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (emphasis added); <u>see</u> <u>generally</u> <u>Booker v. Brown & Williamson Tobacco Co., Inc.</u>, 879 F.2d 1304, 1310 (6th Cir. 1989).

In reviewing a motion for summary judgment, "this Court must determine whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" <u>Patton v. Bearden</u>, 8 F.3d 343, 346 (6th Cir. 1993)(quoting <u>Anderson</u>, 477 U.S. at 251-53).  The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  <u>See also</u> <u>Eastman</u>

<u>Kodak Co. v. Image Technical Servs., Inc.</u>, 504 U.S. 451, 456 (1992).  However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." <u>Anderson</u>, 477 U.S. at 252.  <u>See also</u> <u>Gregory v. Hunt</u>, 24 F.3d 781, 784 (6th Cir. 1994).  Finally, a district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

**B.    Interpretation of the Settlement Agreement**

A release is a contract and is governed by the principles of construction applicable to contracts.  <u>Noroski v. Fallet</u>, 2 Ohio St.3d 77, 79, 442 N.E.2d 1302, 1304 (Ohio 1982); <u>Barnes v. Ricotta</u>, 142 Ohio App.3d 560, 566, 756 N.E.2d 218, 222 (Ohio Ct. App. 2001). In construing a contract, a court must follow the plain language that the parties have chosen to express their intent.  <u>Kelly v. Medical Life Ins. Co.</u>, 31 Ohio St.3d 130, 132, 509 N.E.2d 411, 413 (Ohio 1987) ("The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement."); <u>Point East Condominium Owners' Ass'n v. Cedar House Assocs.</u>, 104 Ohio App.3d 704, 723, 663 N.E.2d 343, 356 (Ohio Ct. App. 1995).  "A court will resort to extrinsic evidence in its effort to give effect to the parties' intentions only where the language is unclear or ambiguous, or where the circumstances surrounding the agreement invest the language of the contract with a special meaning." <u>Kelly</u>, 31 Ohio St.3d at 132, 509 N.E.2d at 413.  When a release is clear and unambiguous, "the court is bound to look within the four corners" of the release. <u>Barnes</u>, 142 Ohio App.3d

12

at 566, 756 N.E.2d at 222.

In the 2005 Settlement Agreement, Divine Tower and Apollo released the Divine Family "and all of their respective agents . . . [and] attorneys . . . from any and all causes of action . . . which [Divine Tower and Apollo] may have or claim to have against the Divine Family." Settlement Agr. ¶¶4,5. This language is clear and unambiguous. The Agreement releases all of Divine Tower's and Apollo's claims against the Divine Family. Further, it releases the Divine Family's attorneys from any claims Divine Tower and Apollo may have against them for actions within the scope of their legal representation of the Divine Family. Ohio courts have found that similar general releases of a party and its agents or attorneys operates to release claims against attorneys acting within their role as legal representative of the releasee. In Pakulski v. Garber, 6 Ohio St.3d 252, 452 N.E.2d 1300 (Ohio 1983), the releases in question applied to claims against certain named releasees and their "agents." The court held that the releases covered the attorney of the releasees: "Appellee McCracken, as legal representative of the Garbers in their publishing company, was their agent and employee. This relationship was within the language of the releases and contemplated by the parties. This court has decided that when a party enters into a written release the release is presumed to be a release for the benefit of all wrongdoers." Pakulski, 6 Ohio St.3d at 255, 452 N.E.2d at 1302 (citations omitted). See also Conforte v. LaSalla, No. 81089, 2002 WL 31479012, at *3 (Ohio Ct. App. Nov. 7, 2002) (holding that release of party and his "agents" operated to "preclude claims against not only the original defendant, but also those claims

13

asserted against their legal counsel").

Plaintiffs argue that the term "attorneys" in the Settlement Agreement really meant the attorneys who represented the Divine Family in the lawsuit captioned <u>Divine Tower International Corp, et al. v. Robert Divine, et al.</u>, Case No. 2:04-cv-162 (S.D. Ohio, Marbley, J.), which the Agreement refers to as "the Divine Family Action." This argument is belied by the express language of the Settlement Agreement, which releases the Divine Family and its attorneys from all claims Divine Tower or Apollo "may have or claim to have against the Divine Family, the Divine Family Companies, and the Trust Defendants, specifically **including but not limited to** those matters that arise from . . . any claim that was (or could have been) made in the Divine Family Action." Settlement Agr., ¶¶4,5 (emphasis added). Thus, the release language is not confined to only those attorneys who were involved in the Divine Family Action. The plain language of the Agreement does not support Plaintiffs' private understanding of what the parties really intended.

Plaintiffs next argue that the "No Release" provision of the Agreement operates to exclude both the Kegler Firm and the Kegler Attorneys from the release. However, the No Release provision excludes only the Kegler Firm, and not the Kegler Attorneys, from the release. <u>See</u> Settlement Agr., ¶10. Plaintiffs offer no reason, either contractual or under principals of agency law, for why they believe the Kegler Attorneys are excluded under the No Release provision. Elsewhere in the Agreement (in the attorney-client waiver provision), the parties make separate references to "the law firm named Kegler, Brown, Hill and Ritter" and to "any

14

individual attorney who is . . . employed by that law firm." Thus, the parties knew how to mention the Kegler Attorneys separately from the Kegler Firm when that was what they meant. In contrast, the parties limited the No Release provision to only the Kegler Firm.

Further, a legal professional association organized under Ohio Revised Code §1785 is regarded as a corporation. State ex rel. Wise, Childs & Rice Co., L.P.A. v. Basinger, 54 Ohio App.3d 107, 108, 561 N.E.2d 559, 561 (Ohio Ct. App. 1988). A corporation is its own legal entity and can sue or be sued in its own name. Avon Poured Wall, Inc. v. Boarman, No. 04CA008448, 2004 WL 1933379, at *3 (Ohio Ct. App. Sept. 1, 2004) (citing State, ex rel. Attorney General v. Standard Oil Co., 49 Ohio St. 137, 177, 30 N.E. 279 (Ohio 1892)). Therefore, the No Release provision is not rendered meaningless if it applies only to the Kegler Firm.

In summary, the Court interprets the Settlement Agreement as releasing all of Plaintiffs' claims against the Kegler Attorneys arising out of their legal representation of the Divine Family. The Agreement, however, does not release Plaintiffs' claims against the Kegler Firm.

**C.   Application**

### 1.   All Claims of Civil Conspiracy and Civil Aiding and Abetting are Released

Divine Tower and Apollo (both on its own behalf and as assignee of KeyBank) assert claims for civil conspiracy and civil aiding and abetting against the Kegler Attorneys and the Kegler Firm. Plaintiffs allege that Defendants are liable for conspiracy and aiding and abetting because they conspired with and assisted

15

the Divine Family in executing a scheme to defraud Plaintiffs.  In particular, the Kegler Attorneys allegedly helped the Divine Family create trusts and sham corporations designed to shield the Divine Family's personal assets.

The Court finds that with respect to the Kegler Attorneys, Divine Tower and Apollo have released their claims for conspiracy and aiding and abetting because the alleged actionable conduct is the Kegler Attorneys' provision of legal services to the Divine Family.  As characterized in the complaint, the factual allegations underlying these claims arise exclusively out of the Kegler Attorneys' legal representation of the Divine Family.  The claims rest on allegations that the Kegler Attorneys prepared documents, created trusts, made misrepresentations, and failed to disclose material facts during the course of their representation of the Divine Family.  The acts that allegedly furthered the conspiracy all relate to the Kegler Attorneys' provision of legal services to the Divine Family.  Similarly, the acts that aided and abetted the Divine Family were the Kegler Attorneys' provision of legal services.  In other words, the claims are not based on allegations that the Kegler Attorneys were acting in some role other than in their capacity as attorneys for the Divine Family.  The claims rest solely on the Kegler Attorneys' alleged actions in providing legal services to the Divine Family, and these claims are therefore released.  See Pakulski, 6 Ohio St.3d at 255, 452 N.E.2d at 1302; Conforte, 2002 WL 31479012, at *3.

The Court further finds that the conspiracy and aiding and abetting claims are released as to the Kegler Firm.  Plaintiffs' theory of recovery against the Kegler Firm is one of vicarious

16

liability.  The complaint alleges no actionable conduct against the Kegler Firm outside of the alleged wrongdoing of the Kegler Attorneys.  Under common law, "the release of a party who is primarily liable operates also as a release of any party who was only secondarily liable."  Niemann v. Post Industries, Inc., 68 Ohio App.3d 392, 396, 588 N.E.2d 301, 303 (Ohio Ct. App. 1991) (citing Bello v. Cleveland, 106 Ohio St. 94, 138 N.E. 526 (Ohio 1922); Losito v. Kruse, 136 Ohio St. 183, 24 N.E.2d 705 (Ohio 1940)).  By operation of law, the liability of the secondary party is necessarily extinguished when the primary party is released. See Comer v. Risko, 106 Ohio St.3d 185, 189, 833 N.E.2d 712, 716-7 (Ohio 2005) (holding that where "there is no liability assigned to the agent . . . there can be no liability imposed upon the principal for the agent's actions"); Radcliffe v. Mercy Hosp. Anderson, Nos. C-960424, 960425, 1997 WL 249436, at *2 (Ohio Ct. App. May 14, 1997) (holding that once the primary party's liability was extinguished, either by settlement and release or by a favorable judgment, the secondary party's liability was necessarily extinguished).

This principle of agency law holds true even when a release agreement purports to reserve claims against the secondary party. A secondary party cannot be held liable for a wrong it did not commit.  See Wells v. Spirit Fabricating, Ltd., 113 Ohio App.3d 282, 294, 680 N.E.2d 1046, 1053 (Ohio Ct. App. 1996) ("[T]he employer cannot be found to be liable for negligence he did not commit.  The employer's liability is dependent on the negligence of the employee.").  As the court in Delta Tank Mfg. Co. v. Weatherhead Co., 150 F.Supp. 525 (N.D. Ohio 1957), held:

17

> Where an injured party effects a settlement with the
> primary wrongdoer, such settlement effectively bars
> further recovery against the party secondarily liable.
> **It makes no difference whether the rights against the
> secondary party were expressly reserved** or whether the
> settlement was in part payment only of the claims or
> whether the settlement was accomplished by a legal
> instrument denominated covenant not to sue or a release.

Delta Tank, 150 F.Supp. at 528 (emphasis added). See also Hillyer
v. City of East Cleveland, 155 Ohio St. 552, 566, 99 N.E.2d 772,
779 (Ohio 1951); Mann v. GTCR Golder Rauner, L.L.C., 351 B.R. 685,
697 (D. Ariz. 2006) (holding that release of an attorney, who was
the primary party, "operated to release K & E [the attorney's firm]
as a matter of law," despite language expressly reserving claims
against the firm); J & J Timber Co. v. Broome, 932 So.2d 1, 7
(Miss. 2006) ("A majority of states have adopted the position that
the release of a tortfeasor thereby releases the tortfeasor's
principal for all claims of vicarious liability, despite any
reservation of rights.") (citing cases).

Accordingly, Divine Tower's and Apollo's claims for conspiracy
and aiding and abetting against the Kegler Attorneys and the Kegler
Firm are released.

### 2. Apollo's Fraud and Section 10(b) Claims are Released in Part

Apollo's fraud and Section 10(b) allegations can be divided
into two types.  First, there are those allegations relating to the
legal services that the Kegler Attorneys provided to the Divine
Family.  These first type of fraud allegations rely on the same
facts that formed the basis of the conspiracy and aiding and
abetting claims.  For instance, in Count Nine for fraud, Apollo (as
assignee for KeyBank) alleges that Defendants committed fraud by

18

creating trusts whereby the Divine Family could shield their assets from the personal guarantees they made to KeyBank.  The Court finds that such allegations of fraud based on the Kegler Attorneys' actions in representing the Divine Family are released.

The second type of fraud allegations relate to Divine Tower's loan transactions with Apollo and KeyBank.  The complaint alleges that the Kegler Attorneys made material misrepresentations and omissions while representing Divine Tower in obtaining financing from Apollo and KeyBank.  For example, in Count Seven for fraud, Apollo alleges that the written due diligence response, the Securities Purchase Agreement, and the Opinion Letter drafted by the Kegler Attorneys on behalf of Divine Tower did not fully disclose the details surrounding the Deere Park loan and the existence of the KeyBank lines of credit.  In Count Nine, the complaint alleges that in representing Divine Tower in its efforts to obtain financing from KeyBank, the Kegler Attorneys failed to disclose that the personal guarantees of the Divine Family would be of no value.[1]

The Court finds that the Settlement Agreement does not release these fraud claims relating to Defendants' actions in helping Divine Tower obtain loans.  The language of the Settlement Agreement releases claims that Apollo had against the Divine Family and their attorneys.  It does not release Apollo's claim against Divine Tower and its attorneys.  Though Thomas Divine allegedly was the driving force behind Divine Tower's pursuit of the loans, the

---

[1]  This particular claim of fraud is not released because, though the claim relies on what the Kegler Attorneys knew about the Divine Family's personal guarantees, the alleged actionable conduct is the Kegler Attorneys' failure to speak while representing Divine Tower in obtaining a loan.

borrower was the company itself.  Attached to the complaint is the Securities Purchase Agreement, a contract entered into between Divine Tower and Apollo.  Likewise, it is Divine Tower who is named as the borrower in the KeyBank letter of credit attached to the complaint.  Finally, in the Opinion Letter attached to the complaint, the Kegler Firm states that it was acting as counsel to Divine Tower in issuing the letter.  In sum, Apollo's fraud and Section 10(b) claims about the loan transactions relate to Defendants' legal representation of Divine Tower, not the Divine Family, and are not released by the Settlement Agreement.

### 3. Divine Tower's Claims for Malpractice, Fraud, and Unjust Enrichment are Not Released

Divine Tower asserts claims for malpractice, fraud with respect to legal services, and unjust enrichment.  Divine Tower alleges that Defendants breached their duty of loyalty by representing other parties (namely, members of the Divine Family) who had interests that Defendants knew to be adverse to Divine Tower's interests.  Divine Tower further alleges that the Kegler Firm fraudulently billed Divine Tower for legal services that it performed for the Divine Family and that it unjustly retained the monies Divine Tower paid for those services.

The Court finds that these claims do not fall within the terms of the Settlement Agreement.  Malpractice concerns "damages resulting from the manner in which the attorney represented the client." Muir v. Hadler Real Estate Mgmt. Co., 4 Ohio App.3d 89, 90, 446 N.E.2d 820, 822 (Ohio Ct. App. 1982).  The malpractice claim is not released because it arises out of Defendants' attorney-client relationship with Divine Tower.  The crux of the malpractice claim is not what Defendants allegedly did as the

Divine Family's attorneys.  Rather, the crux is that Defendants
agreed to represent Divine Tower and then proceeded to represent a
party whose interests conflicted with those of Divine Tower.  An
attorney who agrees to represent a client, as Defendants did Divine
Tower, "may not abandon his client and take an adverse position .
. . . As a matter of professional responsibility, an attorney owes
a duty of loyalty to his client.  This duty encompasses an
obligation to defer to the client's wishes on major litigation
decisions, not to divulge confidential communications from the
client, and not to accept representation of a person whose
interests are opposed to those of the client." Dietz-Britton v.
Smythe, Cramer Co., 139 Ohio App.3d 337, 352-353, 743 N.E.2d 960,
971-72 (Ohio Ct. App. 2000) (internal quotations and citations
omitted). See also Columbus Bar Ass'n v. Ross, 107 Ohio St.3d 354,
359, 839 N.E.2d 918, 923 (Ohio 2006).

Similarly, Divine Tower's claims for fraud with respect to
legal services and unjust enrichment arise out of Defendants'
relationship with Divine Tower.  The crux of those claims is that
the Kegler Firm billed and kept monies paid by Divine Tower for
legal services that the Kegler Firm knew it did not provide to
Divine Tower.  That those billed services happened to be performed
for the Divine Family is incidental.  The claims rest on the
allegation that the Kegler Firm billed and kept the legal fees in
the first place.

Further, even if Divine Tower's claims for fraud and unjust
enrichment did fall within the scope of the Settlement Agreement,
the claims could go forward against the Kegler Firm because the
Agreement's No Release provision excludes the Kegler Firm from the

21

general release of liability.  Unlike the conspiracy and aiding and abetting claims, the claims for fraud and unjust enrichment are brought directly against the Kegler Firm and do not rest on a theory of vicarious liability.  Attached to the complaint are the billing statements received by Divine Tower.  The billing statements were issued by the Kegler Firm, and the monies paid by Divine Tower were allegedly received by the Kegler Firm.  Divine Tower's fraud and unjust enrichment claims are therefore brought directly against the Kegler Firm.

### 4.  Divine Tower's Bankruptcy Preference Claims are Not Released

Divine Tower asserts a claim for an avoidable preference payment under 11 U.S.C. §547.  According to the complaint, Divine Tower paid $63,507 to the Kegler Firm on February 22, 2002.  On April 24, 2002, Divine Tower filed a Chapter 11 bankruptcy petition.  Under Section 547(b)(4)(A), the bankruptcy trustee may avoid a transfer of an interest of the debtor made within 90 days before the bankruptcy filing date, if certain other conditions in §547(b)(1)-(5) are met.  The complaint further alleges that between April 24, 2001 and 90 days before the filing date, Divine Tower paid $63,314 to the Kegler Firm.  Under §547(b)(4)(B), the bankruptcy trustee may avoid a transfer of an interest of the debtor made between one year and 90 days before the bankruptcy filing date, again if certain other conditions are met.

The Court finds that the bankruptcy preference claims are not released by the Settlement Agreement because they concern the relationship between Divine Tower and the Kegler Firm.  The payments were made by Divine Tower to the Kegler Firm.  The preference claims do not arise out of Defendants' representation of

the Divine Family.  And even if the preference claims somehow fell within the scope of the Settlement Agreement, the No Release provision would take them back out because the claims are against the Kegler Firm itself.

       **5.   Summary**

In conclusion, the Court finds that the Settlement Agreement releases Plaintiffs' claims for conspiracy and aiding and abetting, as well as the portion of Apollo's fraud and Section 10(b) claims arising out of Defendants' representation of the Divine Family. The Settlement Agreement does not release Apollo's fraud and Section 10(b) claims relating to Divine Tower's loan transactions, nor does it release Divine Tower's claims for malpractice, fraud with respect to legal services, unjust enrichment, and bankruptcy preference.

## III. Partial Motion to Dismiss

Before filing their motion for summary judgment, Defendants filed a partial motion to dismiss.  That motion to dismiss does not concern Divine Tower's malpractice or bankruptcy preference claims; thus, those two claims will go forward.  The motion does seek dismissal of all other claims.  The motion to dismiss is, of course, moot as to the claims that the Court has found released under the Settlement Agreement.  The Court will now consider the motion to dismiss as to Apollo's remaining fraud and Section 10(b) claims and Divine Tower's fraud and unjust enrichment claims.

### A.   Standard of Review

In ruling on a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in a light most favorable to the

plaintiff and accept all well-pleaded allegations in the complaint as true.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.").  A complaint must contain either direct or inferential allegations with respect to all material elements necessary to sustain a recovery under some viable legal theory.  Weiner v. Klais & Co., Inc., 108 F.3d 86, 88 (6th Cir. 1997).  Though the complaint need not contain detailed factual allegations, the factual allegations must be enough to raise the claimed right to relief above the speculative level and to create a reasonable expectation that discovery will reveal evidence to support the claim.  Bell Atlantic Corp. v. Twombly, ___ U.S. __, 127 S.Ct. 1955, 1964-65 (2007); Associated Gen. Contractors of Cal., Inc. v. Carpenters, 459 U.S. 519, 526 (1983)("It is not . . . proper to assume that [the plaintiff] can prove facts that it has not alleged . . . .").

Plaintiff must provide more than labels and conclusions, or a formulaic recitation of the elements of a cause of action, Twombly, 127 S.Ct. at 1965, and the court is not "bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986); see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)(the court is not required to accept as true unwarranted legal conclusions or factual inferences).  A motion to dismiss under Rule 12(b)(6) will be granted if the complaint is without merit due to an absence of law to support a claim of the type made or of facts sufficient to make a valid claim, or where the face of the complaint reveals that

there is an insurmountable bar to relief.  <u>Rauch v. Day & Night</u>
<u>Mfg. Corp.</u>, 576 F.2d 697 (6th Cir. 1978).

    **B.    Apollo's Fraud and Section 10(b) Claims**

        **1.    Elements and Pleading Standard**

    Apollo's fraud claims are multi-faceted.  In Count Nine,
Apollo asserts a claim as assignee of KeyBank alleging that
Defendants, in their capacities as counsel for Divine Tower, should
have disclosed to KeyBank that the personal guarantees of the
Divine Family would be of no value.  Apollo further alleges that
Defendants should have made the same disclosure when Apollo
restructured its equity position in Divine Tower.

    In Count Seven, Apollo makes several direct claims of fraud.
First, Apollo alleges that Defendants fraudulently induced Apollo
to enter into the Securities Purchase Agreement by making material
misrepresentations and omissions during the due diligence process.
Next, Apollo alleges that the Securities Purchase Agreement drafted
by Defendants contained material misrepresentations and omissions.
Finally, Apollo alleges that the Opinion Letter drafted by
Defendants contained material misrepresentations and omissions.

    In Count Eleven, Apollo alleges that Defendants are liable
under Section 10(b) of the Securities Exchange Act, 15 U.S.C.
§78j(b).  The complaint again alleges that the Securities Purchase
Agreement and the Opinion Letter contained material
misrepresentations and omissions.

    The elements of common law fraud are: (1) a representation or,
where there is a duty to disclose, concealment of a fact, (2) which
is material to the transaction at hand, (3) made falsely, with
knowledge of its falsity, or with such utter disregard and

recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) justifiable reliance upon the representation or concealment, and (6) a resulting injury proximately caused by the reliance.  Russ v. TRW, Inc., 59 Ohio St.3d 42, 49, 570 N.E.2d 1076, 1083-84 (Ohio 1991).

Under Rule 9(b), Fed. R. Civ. P., averments of fraud and the circumstances constituting the fraud must be stated with "particularity."  To comply with Rule 9(b), "a plaintiff, at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'"  Walburn v. Lockheed Martin Corp., 431 F.3d 966, 972 (6th Cir. 2005) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993)).  Scienter may be inferred from circumstantial evidence.  S.E.C. v. Blackwell, 291 F.Supp.2d 673, 696 (S.D. Ohio 2003).

Section 10(b) of the Securities Exchange Act and Rule 10b-5(b) promulgated thereunder prohibit any person from making "fraudulent, material misstatements or omissions in connection with the sale or purchase of a security."  Morse v. McWhorter, 290 F.3d 795, 798 (6th Cir. 2002); see 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5(b).  To state a claim under Section 10(b) and Rule 10b-5(b), plaintiffs must allege, in connection with the purchase or sale of securities: "(1) a misstatement or omission, (2) of a material fact, (3) made with scienter, (4) justifiably relied on by plaintiffs, and (5) proximately causing them injury."  Helwig v. Vencor, Inc., 251 F.3d 540, 554 (6th Cir. 2001); see also In re Comshare, Inc. Sec.

<u>Litig.</u>, 183 F.3d 542, 548 (6th Cir. 1999).

The Private Securities Litigation and Reform Act ("PSLRA"), 15 U.S.C. §78u-4(b), requires complaints asserting a claim of federal securities fraud to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. §78u-4(b)(1). Moreover, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2).

### 2. KeyBank

The Court found above that nearly all of the allegations in Count Nine are of the type that the Settlement Agreement released. Nonetheless, the complaint alleges that Defendants, while representing Divine Tower in its efforts to obtain lines of credit at KeyBank, should have disclosed to KeyBank that the personal guarantees of the Divine Family would be of no value.

The KeyBank fraud claim is one of fraudulent omission, for the complaint does not specify any affirmative misrepresentations that a Kegler Attorney made to KeyBank. In order to state a cause of action for fraudulent omission, there must be a duty to speak. <u>Russ</u>, 59 Ohio St.3d at 49, 570 N.E.2d at 1083; <u>Burr v. Board of County Comm'rs of Stark County</u>, 23 Ohio St.3d 69, 73, 491 N.E.2d 1101, 1105 (Ohio 1986). In Ohio, "[o]rdinarily in business transactions where parties deal at arm's length, each party is

presumed to have the opportunity to ascertain relevant facts available to others similarly situated and, therefore, neither party has a duty to disclose material information to the other." Blon v. Bank One, Akron, N.A., 35 Ohio St.3d 98, 101, 519 N.E.2d 363, 367 (Ohio 1988); see also Interim Healthcare of Northeast Ohio, Inc. v. Interim Services, Inc., 12 F.Supp.2d 703, 712 (N.D. Ohio 1998); Equal Justice Foundation v. Deutsche Bank Trust Co. Americas, No. C2:04-cv-228, 2006 WL 2795211, at *6 (S.D. Ohio Sept. 27, 2006).

Ohio courts recognize three exceptions to the general rule that parties to a business transaction are under no duty to disclose: "(1) when a fiduciary relationship exists between the parties, (2) where a special trust or confidence is understood between the parties, and (3) where disclosure of facts is 'necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts.'" Equal Justice Foundation, 2006 WL 2795211, at *6 (quoting Blon, 35 Ohio St.3d at 101, 519 N.E.2d at 367)).

None of these three exceptions apply here.[2]  The complaint does not allege that a fiduciary relationship existed between Defendants, counsel for the borrower, and KeyBank, the creditor. The relationship of debtor and creditor, by itself, is not a fiduciary relationship. Blon, 35 Ohio St.3d at 101, 519 N.E.2d at 367.  Further, the complaint does not allege that a special trust or confidence had been reposed.  Though Defendants rendered advice

---

[2]  Indeed, in its brief in opposition to the motion to dismiss, Apollo does not even attempt to argue that any of the exceptions apply.  It instead characterizes Count Nine as purely a conspiracy claim.  In the complaint, Count Nine is labeled as both a fraud and a conspiracy claim.

and counsel, they did it for Divine Tower, not KeyBank.  Even then, "the rendering of advice" by one party to another in a business transaction "does not transform the business relationship into a fiduciary relationship." Umbaugh Pole Bldg. Co., Inc. v. Scott, 58 Ohio St.2d 282, 287, 390 N.E.2d 320, 323 (Ohio 1979).  Finally, the complaint does not allege that any of the Kegler Attorneys, as counsel for Divine Tower, created misleading impressions through a partial revelation of facts.  The complaint does not identify any representations that Defendants made to KeyBank.

Accordingly, Apollo's claim for fraud as assignee of KeyBank is dismissed.

### 3.  Fraudulent Inducement

In Count Seven, Apollo alleges that Defendants fraudulently induced Apollo into entering the Securities Purchase Agreement.  In support, the complaint alleges that the Kegler Attorneys met with counsel for Apollo to discuss Apollo's unresolved due diligence concerns.  After the meeting, the Kegler Attorneys drafted a written response to Apollo's concerns.  The complaint alleges that the response contained material misrepresentations and omissions regarding Divine Tower's other financing efforts.  For instance, the complaint alleges that the response did not accurately characterize the status of Divine Tower's loans with Huntington Bank and KeyBank.  The response stated that KeyBank had "removed" the Huntington loan, when in fact what happened, according to the complaint, was that Divine Tower had defaulted on the Huntington loan and had secured lines of credit with KeyBank.  The complaint further alleges that the response mischaracterized certain aspects of the proposed Deere Park loan, such as the amount, purpose, and

status of the loan.

Defendants do not challenge the fraudulent inducement claim on the points where such claims are normally challenged, such as materiality, knowledge, intent, and reliance. Instead, Defendants argue that the parol evidence rule bars Apollo's fraudulent inducement claim. According to Defendants, the parol evidence rule excludes all contract and tort claims based on representations or declarations made prior to or contemporaneously with a completely integrated agreement, when those representations are within the scope of the agreement. Defendants contend that the Securities Purchase Agreement is a completely integrated contract and replaces whatever representations were made in the due diligence response.

Under Ohio law, the parol evidence rule excludes evidence of prior or contemporaneous promises, understandings, or representations that vary from or contradict the terms of a final written contract. Charles A. Burton, Inc. v. Durkee, 158 Ohio St. 313, 109 N.E.2d 265 (1952). The parol evidence rule "is a rule of substantive law designed to protect the integrity of final, written agreements." Busler v. D & H Mfg., Inc., 81 Ohio App.3d 385, 390, 611 N.E.2d 352, 355 (Ohio Ct. App. 1992).

The rule does not bar a party from proving fraud in the inducement of an agreement. See Walters v. First Nat'l Bank of Newark, 69 Ohio St.2d 677, 681, 433 N.E.2d 608, 611 (Ohio 1982); Stegawski v. Cleveland Anesthesia Group, Inc., 37 Ohio App.3d 78, 84, 523 N.E.2d 902, 908-09 (Ohio Ct. App. 1987). A party may challenge the validity of the contract itself as being fraudulently induced, so long as the alleged inducement to enter into the agreement is not a promise contradicted by the written terms of the

contract. See AmeriTrust Co. v. Murray, 20 Ohio App.3d 333, 335, 486 N.E.2d 180, 184 (Ohio Ct. App. 1984); Columbia Gas Transmission Corp. v. Ogle, 51 F.Supp.2d 866, 873 (S.D. Ohio 1997).

Defendants recognize that the parol evidence rule does not bar a party from proving fraudulent inducement. But they contend that the exception has its limits, namely, "[p]arties may not prove fraud by claiming that the inducement to enter into an agreement was a promise that was within the scope of the integrated agreement but was ultimately not included in it." Bollinger, Inc. v. Mayerson, 116 Ohio App.3d 702, 712, 689 N.E.2d 62, 69 (Ohio Ct. App. 1996); accord Citicasters Co. v. Bricker & Eckler, L.L.P., 149 Ohio App.3d 705, 149, 778 N.E.2d 663, 666 (Ohio Ct. App. 2002). The parol evidence rule bars a claim based on an alleged inducement that "pertains to the same subject matter" contained in the signed writing. Bollinger, 116 Ohio App.3d at 712, 689 N.E.2d at 69.

Here, the basis of Apollo's fraudulent inducement claim is that Defendants' due diligence response misrepresented the nature of Divine Tower's loan arrangements with other creditors. Defendants argue that this same subject matter is covered in the Securities Purchase Agreement. They are correct. Section 3.8 of the Agreement, along with Schedule 3.8 attached thereto, called for Divine Tower to list its liabilities, indebtedness, and extensions of credit, among other things. Similarly, Section 3.11 and Schedule 3.11 concern the loan, credit, and security agreements into which Divine Tower had entered. The Agreement lists Divine Tower's loans with Huntington Bank and KeyBank and the status of those loans, but it does not state that Divine Tower had defaulted on the Huntington Bank loan, fully disclose the nature of the

proposed Deere Park loan, or list the KeyBank lines of credit. Thus, the matters on which Defendants allegedly made misrepresentations in their due diligence response are the same matters on which the Securities Purchase Agreement speaks. And under Section 10.6, the Agreement is the entire understanding of the parties and supercedes all prior agreements and understandings. Thus, the matters on which Defendants allegedly made misrepresentations in their due diligence response are the same matters on which the Securities Purchase Agreement speaks. And under Section 10.6, the Agreement is the entire understanding of the parties and supercedes all prior agreements and understandings.

Accordingly, the Court finds that the parol evidence rule bars Apollo's claim for fraudulent inducement. See Bollinger, 116 Ohio App.3d at 713, 689 N.E.2d at 69 (holding that a party cannot show fraudulent inducement where substance of alleged misrepresentation about financing was "part and parcel of the subject matter contained in the integrated agreements"); Citicasters, 149 Ohio App.3d at 149, 778 N.E.2d at 666 (dismissing fraudulent inducement claim based on alleged misrepresentations about existence of liens because the written agreement spoke on that subject).

### 4. Securities Purchase Agreement

Apollo brings fraud and Section 10(b) claims on the grounds that the Securities Purchase Agreement drafted by Defendants contained misrepresentations and omissions. Apollo alleges that Defendants did not fully disclose the nature of the proposed Deere Park loan, even though Section 3.8 and Schedule 3.8 of the Agreement called for that information. Further, though Schedule 3.8 listed the Huntington Bank loan, it did not disclose that

Divine Tower had defaulted on the loan.  Finally, where the Agreement in Section 3.11 and Schedule 3.11 purported to list all of Divine Tower's liabilities above $50,000, the KeyBank lines of credit were not listed.

Defendants argue that this fraud claim must be dismissed because, even though Kegler Attorneys allegedly drafted the Agreement, it belonged to Divine Tower, the client.  According to Defendants, the statements made in the Agreement were the representations of Divine Tower to Apollo.  In support, Defendants rely on Schatz v. Rosenberg, 943 F.2d 485, 495 (4th Cir. 1991), which found in the context of a Section 10(b) claim that "[l]awyers do not vouch for the probity of their clients when they draft documents reflecting their clients' promises, statements, or warranties."

In response, Apollo cites a Sixth Circuit case, Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263 (6th Cir. 1998) (en banc), in which the court held that a lawyer who has contact with a third party on the other side of a transaction is liable under Section 10(b) for any material misrepresentations or omissions he makes.  In Rubin, private investors sued the attorney and law firm who represented a company in which they were interested in investing capital.  The attorney, Mr. Barnhart, spoke directly with the investors and their counsel during the due diligence process and allegedly failed to disclose certain information necessary to make his statements not sound misleading.  Though Barhart had no duty to speak and though, when he did speak, it was on behalf of his client, the court noted that there was "nothing special about Barnhart's status as an attorney."  Rubin, 143 F.3d at 267.  An

33

attorney who chooses to disclose material facts in connection with a transaction "assume[s] a duty to speak fully and truthfully on those subjects." <u>Id</u>. at 268.

What the court in <u>Rubin</u> found to be key was Barnhart's "direct contacts" with the investors:

> "[A] duty to disclose naturally devolve[s] on those who h[ave] direct contacts with 'the other side.'" <u>SEC v. Coffey</u>, 493 F.2d 1304, 1315 (6th Cir. 1974). "Direct contacts may take many forms. An accountant or lawyer, for instance, who prepares a dishonest statement is a primary participant in a violation even though someone else may conduct the personal negotiations with a security purchaser." <u>Id</u>. at 1315 n. 24. "A person undertaking to furnish information which is misleading because of a failure to disclose a material fact is a primary participant." <u>SEC v. Washington County Util. Dist.</u>, 676 F.2d 218, 223 (6th Cir. 1982). Under the long-established precedents of this circuit, the conversations between Barnhart and the plaintiffs clearly were instances of "direct contacts" sufficient to give rise to a duty to disclose.
>
> . . . [W]hile an attorney representing the seller in a securities transaction may not always be under an independent duty to volunteer information about the financial condition of his client, he assumes a duty to provide complete and nonmisleading information with respect to subjects on which he undertakes to speak. As the Seventh Circuit so aptly put the point, "[u]nder Rule 10b-5 ... the lack of an independent duty does not excuse a material lie." <u>Ackerman v. Schwartz</u>, 947 F.2d 841, 848 (7th Cir. 1991).

<u>Rubin</u>, 143 F.3d at 267-68. The court extended its ruling to an Ohio fraud claim because the elements of fraud and Section 10(b) claims are similar. <u>Id</u>. at 270.

<u>Rubin</u> is controlling precedent with respect to Apollo's Section 10(b) claim. And with respect to Apollo's fraud claim, <u>Rubin</u> is fully consistent with the Ohio Supreme Court's holding in <u>Blon</u> that a duty to speak arises when disclosure of facts is

34

"necessary to dispel misleading impressions that are or might have been created by partial revelation of the facts." <u>Blon</u>, 35 Ohio St.3d at 101, 519 N.E.2d at 367.

Here, the complaint alleges that Defendants met directly with counsel for Apollo to discuss outstanding due diligence issues. The complaint further alleges that following the meeting, Defendants drafted a response to Apollo's concerns. Finally, the complaint alleges that Defendants drafted the Purchase Agreement, knowing that it contained material misrepresentations and omissions on the same matters -- namely the Huntington Bank, Deere Park, and KeyBank loans -- about which Defendants had prior contacts with Apollo. The Court finds that these direct contacts are a sufficient basis for holding Defendants liable for the alleged material misrepresentations and omissions in the Agreement. <u>See</u> <u>In re Enron Corp. Sec., Derivative & ERISA Litig.</u>, 235 F.Supp.2d 549, 610 (S.D. Tex. 2002) (relying on <u>Rubin</u> to find that lawyers, "when they take the affirmative step of speaking out, whether individually or as essentially an author or co-author in a statement or report, whether identified or not, about their client's financial condition, do have a duty to third parties not in privity not to knowingly or with severe recklessness issue materially misleading statements on which they intend or have reason to expect that those third parties will rely").

Accordingly, the motion to dismiss is denied as to Apollo's fraud and Section 10(b) claims relating to the Securities Purchase Agreement.

### 5.   Opinion Letter

Apollo makes similar allegations of why the Opinion Letter

35

written by the Kegler Firm to Apollo was misleading. Apollo alleges that the Opinion Letter failed to disclose, among other things, the nature of the Deere Park loan and the existence of the KeyBank lines of credit.

Section 5.5 of the Purchase Agreement required the Kegler Firm to issue an Opinion Letter on ten enumerated topics, each dealing with Divine Tower's corporate existence and authority. The Opinion Letter addressed each of those topics and limited the letter's scope "to the matters expressly set forth herein." See Opinion Letter, p. 7. It further disclaimed any opinion with respect to the truth or accuracy of any financial information supplied to Apollo by Divine Tower. Id.

Defendants argue that this case is similar to Primus Automotive Fin. Servs., Inc. v. Otto-Wal, Inc., No. 3:98-cv-7424, 2000 WL 621176 (N.D. Ohio April 3, 2000), where a law firm was sued for alleged omissions in an opinion letter. The opinion letter was limited in scope to the client/seller's authority to execute, deliver and perform an asset purchase agreement. The purchaser brought suit alleging that the firm had not disclosed in the opinion letter that the seller's financial information was inaccurate. The court held that the firm was not liable for the alleged omissions because the opinion letter "did not render any opinions regarding the financial status of [the seller] or represent that [the firm] reviewed any documents related to the financial status of [the seller]." Id. at *8.

The Court finds that Apollo's fraud and Section 10(b) claims regarding the Opinion Letter must be dismissed. An attorney who has direct contact with the "other side" in a business transaction

36

has a duty to speak fully and truthfully on only those subjects on which he speaks.  Rubin, 143 F.3d at 268.  The subjects on which the Kegler Firm spoke in the Opinion Letter were expressly limited to matters involving Divine Tower's corporate existence and authority.  In contrast to the Purchase Agreement, which did directly address Divine Tower's loans and liabilities with other creditors, the Opinion Letter did not purport, and indeed expressly disclaimed, to touch on issues regarding Divine Tower's financial affairs.

### 6.  Restructuring of Apollo's Equity Position

Apollo alleges that in October 2000, KeyBank declared Divine Tower in default of its loan and seized $10 million that Divine Tower had set aside to secure one of the lines of credit.  In May 2001, KeyBank, Apollo, and Thomas Divine met to discuss loan forbearance terms.  The complaint does not allege that Defendants attended this meeting.  KeyBank stated that it would reserve its right to recover on the Divine Family's personal guarantees.  In July 2001, Apollo restructured its equity interest in Divine Tower, gaining a fifth seat on the board in exchange for providing additional financing.  The complaint further alleges that in August 2001, KeyBank, Apollo, Thomas Divine, and Defendants participated in a conference call in which KeyBank again said that it was reserving its right to recover on the personal guarantees.

Apollo alleges that before it restructured its equity position, Defendants should have disclosed to Apollo that the Divine Family's personal guarantees were of no value.  However, Apollo is unable to point to any viable theory of why Defendants had a duty to disclose.  The complaint mentions two meetings, the

37

first of which Defendants are not alleged to have participated in. The complaint does allege that Defendants participated in the August 2001 conference call, but it does not allege that Defendants spoke, such as to give rise to a duty to disclose under <u>Blon</u> or <u>Rubin</u>.

Apollo argues that Defendants owed a duty to disclose because it held seats on Divine Tower's board of directors. Apollo argues that as counsel for Divine Tower, Defendants had a duty to advise the company and its board of directors of matters within their knowledge affecting the company, particularly that the KeyBank loan was not properly secured.

As Defendants point out, Apollo's argument misses the mark. According to the complaint, Defendants' duty to disclose ran to Divine Tower and its board. The duty did not run to Apollo, the investor. The duty alleged by the complaint was a duty to "advise," a duty stemming from Defendants' attorney-client relationship with Divine Tower. Where a breach of an attorney-client duty is alleged, the cause of action is one for malpractice and it belongs to the company, Divine Tower, not the shareholder, Apollo. The only way for Apollo to assert the claim is to bring a shareholder-derivative suit, which it has not done. <u>See</u> <u>Boedeker v. Rogers</u>, 140 Ohio App.3d 11, 21, 746 N.E.2d 625, 633 (Ohio Ct. App. 2000) (where shareholder brings suit against a law firm for injury done to the client corporation, it must be brought as a derivative action).

Accordingly, Apollo's fraud claim regarding the restructuring of its equity position in Divine Tower is dismissed.

C.    **Divine Tower's Fraud and Unjust Enrichment Claims**

Defendants argue that Divine Tower's claims for fraud with respect to legal service and unjust enrichment must be dismissed as duplicative of its malpractice claim.  In Ohio, a claim "against one's attorney for damages resulting from the manner in which the attorney represented the client constitutes an action for malpractice within the meaning of R.C. 2305.11, regardless of whether predicated upon contract or tort or whether for indemnification or for direct damages." Muir v. Hadler Real Estate Mgmt. Co., 4 Ohio App.3d 89, 90, 446 N.E.2d 820, 822 (Ohio Ct. App. 1982).  Thus, a client's action against his attorney for damages resulting from the attorney's professional misconduct is a claim for malpractice, no matter how the client labels that claim in his complaint.  "Malpractice by any other name still constitutes malpractice." Id. (citing Gillett v. Tucker, 67 Ohio St. 106, 65 N.E. 865 (1902)).  Accord Omlin v. Kaufman & Cumberland Co., L.P.A., 8 Fed. Appx. 477, 479 (6th Cir. 2001); National Union Fire Ins Co. v. Wuerth, No. C2:03-cv-160, 2007 WL 2071911, at *10 (S.D. Ohio July 17, 2007); Thut v. Canala, No. 2004-L-063, 2005 WL 2000744, at *3 (Ohio Ct. App. Aug. 19, 2005).

Nonetheless, "not all fraudulent conduct will always [fall] under the umbrella of a general malpractice claim." Endicott v. Johrendt, No. 99AP-935, 2000 WL 796576, at *4 (Ohio Ct. App. June 22, 2000) (citing DiPaolo v. DeVictor, 51 Ohio App.3d 166, 555 N.E.2d 969 (Ohio Ct. App. 1988)).  When "an attorney provides services that are not necessarily legal in nature" or acts for his own personal gain, "the attorney's actions may constitute a cause of action for fraud separate from a malpractice claim." Gullatte

39

v. Rion, 145 Ohio App.3d 620, 626, 763 N.E.2d 1215, 1219 (Ohio Ct. App. 2000).

In determining whether a claim against an attorney should be treated as one for malpractice, the court must consider "the gist of the complaint." Hibbett v. Cincinnati, 4 Ohio App.3d 128, 131, 446 N.E.2d 832, 836 (Ohio Ct. App. 1982). The gist of Divine Tower's claims for fraud and unjust enrichment is that the Kegler Firm billed and retained payment for services it did not perform for Divine Tower. The fraud claim alleges that in the invoices sent to Divine Tower, the Kegler Firm knowingly and fraudulently overstated the amount of services it had performed. Divine Tower paid the billed amounts in reliance on the accuracy of the invoices it received from the Kegler Firm. The unjust enrichment claim similarly alleges that the Kegler Firm billed Divine Tower for services performed for other clients and unjustly retained the fees Divine Tower paid.

These claims do not arise out of the manner in which the Kegler Firm exercised legal judgment or handled their representation of Divine Tower. Rather, these claims concern the ordinary standards that govern business transactions. Divine Tower alleges that it paid for services it did not receive. It is incidental that the supplier of services was a law firm; what matters is the allegation that the Kegler Firm fraudulently charged Divine Tower for services it performed for someone else. See Snell v. Performance Assocs. Corp., No. 13765, 1993 WL 541634, at *5 (Ohio Ct. App. Dec. 22, 1993) ("Status as an attorney cannot shield a person from an action for conversion when he has disbursed the [client's] funds to other parties."). In Dzambasow v. Abakumov,

40

No. 86021, 2005 WL 3475792 (Ohio Ct. App. Dec. 20, 2005), clients
brought suit against their attorney for fraud and unjust
enrichment, alleging that they had paid fees and a nonrefundable
retainer, but the attorney had failed to provide substantial legal
services. The court held that the claims were not ones for
malpractice because they "[did] not involve any allegation that
[the attorney] exercised any legal judgment on their behalf or
neglected a legal matter they entrusted to him." Dzambasow, 2005
WL 3475792, at *3.

Accordingly, Divine Tower's fraud and unjust enrichment claims
are not dismissed.


## IV.  Conclusion

For the reasons stated above, Defendants' motion for summary
judgment (doc. 65 in Case No. 04-cv-494; doc. 53 in Case No. 04-cv-
584) is granted in part and denied in part. The Settlement
Agreement releases Plaintiffs' claims for conspiracy and aiding and
abetting, as well as the portion of Apollo's fraud and Section
10(b) claims arising out of Defendants' legal representation of
the Divine Family. The Settlement Agreement does not release the
portion of Apollo's fraud and Section 10(b) claims relating to
Defendants' representation of Divine Tower in its loan
transactions, nor does it release Divine Tower's claims for
malpractice, fraud, unjust enrichment, and bankruptcy preference.

Defendants' partial motion to dismiss (doc. 26 in Case No. 04-
cv-494; doc. 18 in Case No. 04-cv-584) is granted in part and
denied in part. The motion is granted as to all of Apollo's fraud
and Section 10(b) claims, except for those concerning the

Securities Purchase Agreement.  The motion is denied as to Divine Tower's claims for fraud and unjust enrichment.

The claims still remaining in this action are Apollo's fraud and Section 10(b) claims concerning the Securities Purchase Agreement and Divine Tower's claims for malpractice, fraud, unjust enrichment, and bankruptcy preference.


                                    s/ James L. Graham
                                    JAMES L. GRAHAM
                                    United States District Judge

DATE: September 4, 2007

42